UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RAYMOND REID,

                         Plaintiff                        DECISION AND ORDER

-vs-

                                                  18-CV-6042 CJS

COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.
_____

## INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the application of Raymond Reid ("Plaintiff") for Supplemental Security Income

Benefits ("SSI").   Plaintiff claims to be disabled primarily due to chronic right knee pain,

but the Commissioner found otherwise.   Now before the Court is Plaintiff's motion for

judgment on the pleadings (Docket No. [#7]) and Defendant's cross-motion [#11] for the

same relief.   Plaintiff's application is denied and Defendant's application is granted.

## FACTUAL BACKGROUND

The reader is presumed to be familiar with the facts and procedural history of this

action.   The Court will briefly summarize the record as necessary for purposes of this

Decision and Order.

Plaintiff was born in November, 1990.   In or about September, 2008, Plaintiff

had "partial lateral meniscectomy and poster cruciate ligament surgery" on his right

knee.[1]

On January 12, 2012, Plaintiff was treated in the Rochester General Hospital ("RGH") Pediatric Emergency Department for a new injury to his right leg after he was struck by a car.[2]  X-rays showed no fracture,[3] and the diagnosis was "contusion of the knee," for which Plaintiff was told to take Ibuprofen for pain.[4]  On January 17, 2012, radiological studies of the right knee were taken, which were essentially normal.[5]  On January 29, 2012, Plaintiff obtained an MRI of the right knee, which showed normal results (unchanged from the prior surgery), except for "minimal new superficial chondral irregularity at the lateral patellar cartilage."[6]

On March 12, 2012, Plaintiff obtained additional studies of the *left* knee, consisting of "AP views with valgus and varus stress applied," which found "marked widening of the lateral compartment during varus stress suggestive of laxity or deficiency of the capsular and ligamentous elements laterally."[7]

On November 1, 2012, Plaintiff sought treatment from his primary care physician, Pradip Kadakia, M.D. ("Kadakia") for a respiratory infection, at which time he indicated

---

[1] 326

[2] 330, 331 ("mva ped struck")

[3] The Court notes with disapproval that Plaintiff's counsel has misstated this fact in her Memorandum of Law [#7-1] in support of Plaintiff's Motion for Judgement on the Pleadings.   In particular, the memo of law states:   "Plaintiff's knee was dislocated and he had a tibia/fibia fracture and ligamentous injury." *Id.* at p. 2.   Here, however, counsel is quoting the ER doctor's preliminary differential diagnosis, not the actual diagnosis.   The record is clear that diagnostic testing ruled out a fracture, and the actual diagnosis was a mere contusion.   Defendant pointed out this inaccuracy in her responding memo of law (Docket No. [#11-1] at p. 2) ("Emergency room staff at first suspected that the hand a dislocated knee and broken leg, but x-rays were negative for any bony injury"), but Plaintiff did not correct or acknowledge it in his Reply.

[4] 254, 345

[5] 330-331

[6] 326-327

[7] 332

that his "exercise include[d] football, all sports and swimming."[8] Kadakia indicated that his physical examination was "negative for bone/joint symptoms," and that Plaintiff was in no apparent distress.[9]

On November 28, 2012, Plaintiff went back to Kadakia, complaining of lower back pain that had begun two weeks earlier without any precipitating injury.[10] Plaintiff indicated that he had persistent pain low-back pain, without radiation, that was "diffuse, discomforting, sharp and throbbing," and was made worse by "changing positions, extension, flexion, rolling over in bed and standing."[11] Upon examination, Kadakia[12] found decreased lumbar mobility, posterior tenderness, muscle spasm, bilateral lumbosacral tenderness, and tenderness to palpation at L4 to L5.[13] Kadakia recommended that Plaintiff take Ibuprofen and have an MRI "to rule out diskitis and other lumbar spine abnormalities."[14]

On December 16, 2012, Plaintiff complained of tenderness in the "upper spine"[15] following a motor vehicle accident ("MVA").[16] On January 3, 2013, Plaintiff returned to Kadakia complaining of continued "shoulder pain and back pain" related to the MVA. However, upon examination Kadakia found absolutely no objective indication of injury or limitation to either the upper spine or lower spine.[17] In particular, Kadakia

---

[8] 301
[9] 303
[10] 305
[11] 305
[12] The Court is aware that at times other members of Kadakia's practice, such as Physician's Assistants, actually interacted with Plaintiff. In those instances the Court uses "Kadakia" as shorthand.
[13] 306.
[14] 306.
[15] 309
[16] 308
[17] 264-265

noted normal mobility and curvature in both the cervical and lumbar spines, no tenderness of the back, no signs of inflammation, normal gait, no paraspinal tenderness and full range of motion.[18]

On January 9, 2013, an MRI of Plaintiff's lumbar spine showed only "[m]inimal degenerative disc disease at L2-3 and L3-4," "very mild diffuse disc bulging from L2-3 through to L4-5" and "no focal disc herniation or nerve root compression."[19]

On January 14, 2013, returned to Kadakia's office to receive the results of the MRI testing.   Upon examination, Kadakia found "tenderness at [the] lumbosacral spine area" and "mild paraspinal tenderness," but also "good strength" in the lower extremities and "normal sensation."[20]   Kadakia encouraged Plaintiff to follow up with an orthopedic specialist.

Two days later, on January 16, 2013, Plaintiff went to the Emergency Department at RGH, again complaining of lumbar pain which he described as constant, "moderate," "aching" and non-radiating.[21]  Plaintiff reportedly stated that Ibuprofen had provided only mild relief.   Plaintiff indicated that he had an appointment with an orthopedic specialist the following week, but felt he couldn't wait for that, "due to the pain."[22]   The examining doctor noted that Plaintiff had "normal mood and affect" and "normal" behavior.[23] The physician opined that Plaintiff's condition was "improving" and

---

[18] 264-265
[19] 249, 290
[20] 271
[21] 257
[22] 260
[23] 259

4

that he should follow up with his primary care physician.[24]

The next day, January 17, 2013, Plaintiff returned to Kadakia's office, claiming that his pain was "worse at all times," and that he was unable to "sit, walk, bend or twist."[25]   Upon examination, Kadakia found mild tenderness over the lower lumbosacral spine, muscle spasms and mildly limited extension of the lower back, but reported that Plaintiff moved about the room easily, could heel-toe walk "without difficulty" and had full strength.[26]   Kadakia reassured Plaintiff that the MRI results were mild, with "no disc herniation or stenosis," and that "the majority of [Plaintiff's] pain [was] due to inflammation and muscle spasm," which would "take additional time to improve."[27]  Kadakia prescribed Flexeril and physical therapy, and told Plaintiff to return in six weeks.[28]

On January 30, 2013, Kadakia filled out a disability report for the Monroe County Department of Social Services.[29]   Kadakia indicated that Plaintiff's "chief complaint" was "low back pain."[30]   Despite Plaintiff's subjective complaints, Kadakia indicated that upon physical examination, Plaintiff was "normal" in every one of seventeen separate categories, including "musculoskeletal" and "neurological."[31]   Kadakia declined, however, to express an opinion concerning Plaintiff's ability to work, stating, "To be decided by orthopedic surgeon."[32]

---

[24] 259
[25] 276
[26] 277
[27] 277
[28] 277
[29] 398-401
[30] 399
[31] 400-401
[32] 398

The following month, on February 25, 2013, Plaintiff underwent a consultative examination by Harbinder Toor, M.D. ("Toor"), apparently at the request of the Monroe County Department of Social Services.[33]   Toor noted that Plaintiff was primarily complaining of right-knee pain and low-back pain.[34]   Toor indicated that Plaintiff was complaining of "excruciating" pain in both his right knee and lower back.[35]   Upon examination, Toor reported a "slight" limp to the right side, limited ability to squat, tenderness of the right knee, limited lumbar flexion, extension and rotation, and positive straight-leg raising bilaterally.[36]   Toor opined that during a workday, Plaintiff could walk for "1-2 hours"; stand for "1-2 hours"; sit for "2-4 hours"; push, pull and bend "1-2 hours"; use stairs or climb for "1-2 hours"; and lift 10 lbs "occasionally."   Toor further concluded that Plaintiff would be unable to work for three months, but would be able to work within six months.[37]

On July 18, 2013, Plaintiff returned to Kadakia complaining of "right-sided low back pain and spasm," which was "worse when standing, bending, twisting and walking for extended distances."[38]  Plaintiff also claimed that he could not lift more than twenty pounds without feeling low back pain.   Plaintiff admitted, though, that he had not gone to physical therapy as Kadakia had recommended.   Plaintiff denied any "recreational drug use."[39]   Upon examination, Plaintiff was "tender to palpation over the right

---

[33]  402-405
[34]  402
[35]  403
[36]  403
[37]  405
[38]  294
[39]  294

paraspinal muscles" and mildly limited, with "mild" pain, when extending his back.[40]

Kadakia reiterated that Plaintiff should attend physical therapy for "lumbar stabilization,"

and opined that Plaintiff could "work in a more sedentary position" that did not involve

"heavy lifting, excessive standing, walking, or repetitive bending or twisting."[41] Kadakia

recommended that Plaintiff return in "8-10 weeks for evaluation."[42]

On April 25, 2014, without having returned to Kadakia for evaluation and without

having pursued physical therapy, Plaintiff applied for SSI benefits, at which time he

claimed to be disabled due to attention deficit hyperactivity disorder, right leg "pins,"

"bulging disc in lower back," "memory issues" and Tourette's syndrome. (202).

On July 31, 2014, Plaintiff completed a report of his daily activities.   Plaintiff

indicated that he could perform all of the normal activities of daily living (personal

hygiene, cleaning, cooking), but was limited somewhat due to leg pain, involving his

right knee and shin. (213-215, 221). Plaintiff indicated that the pain began after surgery

on his knee. (220).   Plaintiff stated that he was unable to sit or stand for too long due to

such pain. (213-215).   He stated, though, that he went outside every day and traveled

around via bicycle, public transportation and rides from friends. (215).   Plaintiff stated

that approximately once per month he "worked out" and played sports, but not as

intensely as he had done before injuring his leg. (216).   Plaintiff stated that he spent his

days socializing, visiting relatives and spending time with his infant child and with the

"baby's mother." (213-217).

---

[40] 295
[41] 295
[42] 295

On September 3, 2014, Plaintiff had a consultative psychiatric examination by Adam Brownfeld, Ph.D. ("Brownfeld") at the Commissioner's request. Brownfeld's report is remarkable because it contains several statements by Plaintiff that do not appear anywhere in the record prior to that point. For example, Plaintiff alleged, for the first and only time in the record, that he had been depressed for years:

> The claimant reported difficulty falling asleep and a loss of appetite and lost 15 pounds in six months.[43] The claimant reported experiencing depressive symptoms for two years. He reported dysphoric mood, crying spells, loss of usual interests, irritability, diminished self-esteem, diminished sense of pleasure, and social withdrawal.[44]

Plaintiff also claimed, for the first and only time in the record, to have difficulty in social settings due to Tourette's syndrome:

> He reported that he does not like to go out in public because of Tourette syndrome and he is embarrassed. He copes by drinking and smoking marijuana. . . . He reported having palpitations and breathing difficulties in social situations which worsen his Tourette syndrome.

Plaintiff also claimed, for the first and only time in the record, that he had no social life and spent his days at home.[45] However, despite those assertions Brownfeld found "no evidence of limitation" with regard to Plaintiff's ability to "relat[e] adequately with

---

[43] Plaintiff's claim about weight loss seems dubious, since two weeks later it was reported that he weighed 204 pounds, see, 391, which was approximately what he weighed throughout the relevant period, if not more.

[44] 385

[45] 387 ("He denied a social life and reported a 'rocky' relationship with his grandmother because of his drinking habits. His hobby is going to the park. He spends his days staying home."). In the disability report that he completed on July 31, 2014, Plaintiff claimed that he spent time with family and friends "daily," "just talk[ing]," "rid[ing] around" in cars and "crack[ing] jokes." 217 He further stated that he had "no problem" getting along with others. 217. Plaintiff also told another consultative examiner that he regularly "goes to the park, and socializes with friends." 391

others."[46]

Upon examination, Brownfeld indicated that he observed Plaintiff have "facial tremors at times due to Tourette syndrome," but otherwise he reported normal findings, except for slightly limited memory, below average intelligence, poor judgment and poor insight. Brownfeld's opinion concerning Plaintiff's judgment and insight is apparently based solely on Plaintiff's statements concerning his alleged use of alcohol and marijuana to cope with his Tourette's symptoms. *See*, 387 ("He is markedly limited in making appropriate decisions and appropriately dealing with stress given his substance abuse history."). Overall, Brownfeld found that Plaintiff had only the following limitations: "He is mildly limited in maintaining a regular schedule, learning new tasks, and performing complex tasks independently, but does not require supervision. He is markedly limited in making appropriate decisions and appropriately dealing with stress given his substance abuse history."[47]

On September 18, 2014, consultative examiner Karl Eurenius, M.D. ("Eurenius") performed an internal medicine examination at the Commissioner's request.[48] Eurenius's report indicates that Plantiff's chief complaints were "right knee pain, back pain, asthma, and Tourette syndrome,"[49] though Plaintiff apparently did not complain of any functional limitations relating to either the asthma or Tourette's syndrome. Further, Eurenius specifically noted that he observed "no evidence of Tourette syndrome

---

[46] 387
[47] 387
[48] 390-394
[49] 390

throughout the evaluation."[50]   Plaintiff reportedly stated, though, that he felt "intermittent now almost constant" low back pain, occasionally radiating into his left leg, which worsened if he stood or sat for too long.   Plaintiff also indicated that he had "pain in his right knee that often radiates into his shin," which was "made worse by walking, climbing stairs, riding a bike or cold weather."[51]   Plaintiff indicated that he lived alone and performed his own household chores, but had difficulty with prolonged standing, bending and using stairs.[52]   Plaintiff described his daily activities as caring for his daughter four days per week, watching television, listening to the radio, "go[ing] to the park and socializing with friends."[53]   Plaintiff also stated that he used "'lots' of marijuana and liquor,"[54] though there is no indication that he viewed such use as a problem or that he was making any effort to cut back such consumption.   Nor did Plaintiff tell Eurenius that such alleged consumption was related to "coping" with Tourette's syndrome.

Upon examination, Eurenius observed that Plaintiff appeared to be in no acute distress; had a normal gait; could walk on his toes, but with some pain in the lower back; could squat only halfway; needed no help getting on or off the examining table; and rose from his chair without difficulty.[55]   Eurenius further noted that Plaintiff had somewhat restricted (45 degrees) flexion in the lumbar spine with pain, but full extension and lateral flexion bilaterally.   Further, Eurenius observed that rotation of the

---

[50] 391
[51] 390
[52] 391
[53] 391
[54] 391
[55] 391

lumbar spine was painful, and straight-leg-raising was positive bilaterally.[56] Eurenius stated that the left knee seemed "slightly loose" and tender, while the right knee showed signs of chronic swelling but "without signs of acute inflammation."[57] Eurenius's medical source statement was as follows:

> In my opinion he is moderately limited in bending, lifting, carrying, pushing or pulling due to chronic low back pain. He is also moderately limited in kneeling, squatting, climbing and prolonged walking due to right knee pain. He should avoid dust and respiratory irritants because of asthma.[58]

In June, 2015, after a hiatus of approximately two years, Plaintiff contacted Kadakia's office to have disability forms completed.[59] In response, the office apparently scheduled an appointment for September 14, 2015. During an office visit on that date, at which Plaintiff was seen by Physician's Assistant William Duff, PA ("Duff"), Plaintiff again requested to have disability forms completed.[60] Plaintiff reportedly told Duff that he was "undergoing alcohol and [marijuana] rehab," though without specifying where, and stated that he hoped to go to college to become an athletic trainer.[61] Plaintiff stated that he had a "moderate activity level," and that his "exercise include[d] cycling and walking" and "exercis[ing] daily."[62] Plaintiff evidently complained of "joint pain," but did not indicate that he was taking any pain medication.[63] Upon examination, Duff found that Plaintiff's right knee was "normal," while his left knee

---

[56] 392
[57] 392
[58] 393
[59] 415-416
[60] 419, 410-413
[61] 419
[62] 420-421
[63] 422

apparently had some unspecified restriction with regard to range of motion.[64]  Plaintiff

exhibited "appropriate" mood and affect and "normal" insight and judgment.[65]

Following this office visit, Duff filled out a disability form.[66]  Duff noted that

Plaintiff had not been to the office for treatment "since 2013."[67]  Duff opined that

Plaintiff was capable of working 40 hours per week, but that due to right knee pain he

should alternate between sitting and standing every two hours, and should avoid

standing on ladders.[68]  Duff also indicated, apparently based only on what Plaintiff told

him, that Plaintiff was "currently enrolled" in a substance abuse treatment program,[69]

but there is no evidence of such treatment in the record.[70]  In any event, Duff asserted

that upon physical examination Plaintiff was "normal" in every one of seventeen

separate categories, and that during an eight-hour workday Plaintiff could walk, stand,

sit, push, pull, bend, see, hear, speak, lift and carry, each for at least four hours.[71]

On December 22, 2015, Plaintiff returned to Kadakia's office complaining of head

pain after being hit on the head with a "metal pole."  Plaintiff complained of intermittent

headache, but upon examination the physical, neurological and psychiatric findings

were all normal,[72] and a later CT scan of Plaintiff's head was also normal.[73]

On April 5, 2016, Plaintiff once again returned to Kadakia's office complaining of

---

[64] 423
[65] 424
[66] 425
[67] 410
[68] 411
[69] 411
[70] The record indicates only that Plaintiff attended treatment in 2006 and 2007, which he did not complete. *See*, 386 (Brownfeld Consultative Report)
[71] 412-413
[72] 428
[73] 433

chronic pain in his right knee. In particular, Plaintiff complained of pain in the back of the knee and "weakness with doing stairs."[74] There is no indication that Plaintiff complained of any other problems. Kadia again recommended that Plaintiff see an orthopedic surgeon, and that in the meantime he use Ibuprofen, wear a knee brace, ice the knee, and elevate the leg. Kadakia also commented that Plaintiff displayed appropriate mood and affect, and normal insight and judgment.[75] During the same office visit, Plaintiff indicated that he had stopped taking all other medications, such as for his asthma and ADHD.[76]

On April 28, 2016, diagnostic testing of Plaintiff's right knee showed "changes to prior ACL reconstruction" and "mild to moderate changes of degenerative arthropathy."[77]

After Plaintiff's SSI claim was denied initially, on November 14, 2016, a hearing was conducted before an Administrative Law Judge ("ALJ"). When Plaintiff applied for SSI benefits, he had completed high school, where he claimed that he earned "Bs and Cs,"[78] was twenty-three years of age, and had "never worked." (198, 202, 207).[79] At the hearing, Plaintiff indicated that during the prior year he had worked at a few different jobs, but had typically remained at them for only about six weeks at the most before being fired for tardiness. (40-42).[80] Plaintiff attributed such tardiness to a lack of

---

[74] 434
[75] 436
[76] 435
[77] 438
[78] 302. Plaintiff did not tell Kadakia that he received special education. *Id.* However, he later told Brownfeld that he "was enrolled in special education due to [ADHD]." 385
[79] The record indicates that prior to 2012, Plaintiff had combined reported earnings for 2008, 2009 and 2010 were $451 dollars. (195)
[80] Plaintif states that at one such job, as a cook in a restaurant, he found it difficult to stand for long

transportation.   As of the hearing date, one of Plaintiff's longest periods of employment was as a "seasonal" helper for a UPS driver, for which he earned a total of $1,426.[81] Plaintiff indicated that the job with UPS involved riding around in a delivery truck, getting in and out of the truck, going in and out of buildings, and delivering packages, including tires weighing up to 40 pounds.[82]   Such work was performed in 2015, long after the alleged onset of Plaintiff's disability,[83] but there is no indication that he was unable to perform it due to his alleged physical limitations.   Rather, the job ended because it was seasonal.[84]   Plaintiff testified, however, that he had "issues" getting on and off the UPS truck, and that the lifting caused his "lower back to start hurting."[85]   Plaintiff further testified that another one of his recent jobs, as a cook in a restaurant, required him to stand for six to seven hours at a time, which he was able to do even though it was "uncomfortable."[86]   Plaintiff noted that he had just interviewed for another job the week prior to the hearing, which involved working in a warehouse for a coffee distribution company.[87]

Plaintiff indicated at the hearing that he spends "half the day" with his right leg elevated,[88] though it is unclear how that would be possible given his descriptions of his daily activities, including past work activities, elsewhere in the record. Plaintiff indicated that he still rides his bicycle, for up to 35 minutes at a time, and that he had just ridden

---

periods while cooking, but there is no indication that had anything to do with him being fired. *See*, 40-41
[81]  188
[82]  43-45
[83]  188
[84]  45
[85]  50
[86]  50
[87]  57-58
[88]  48

14

the bicycle the day prior to the hearing.[89] Plaintiff indicated that he was not taking any

medications and was not in any kind of counseling.[90] Plaintiff testified that he uses

marijuana, but only at night when he is unable to sleep.[91]

A vocational expert ("VE") testified at the hearing.   In pertinent part, the ALJ

asked the VE to consider a hypothetical claimant, with Plaintiff's age, education and

work experience, and to indicate whether there was any unskilled work , involving

routine tasks, low stress and only occasional decision-making, that such a person could

perform if he was limited to only occasionally stooping, only occasionally walking up

stairs, never climbing ladders or scaffolds, having only occasional exposure to

respiratory irritants, and needing to change position each hour.[92]   The VE indicated that

there are such jobs, including "office helper," "parking lot attendant" and "mail clerk."[93]

On December 21, 2016, the ALJ issued a decision denying Plaintiff's

application.[94] The ALJ relied on the VE's testimony and found, at the fifth step of the

familiar five-step sequential analysis for evaluating such claims, that there are jobs in

the national economy that Plaintiff can perform.

More specifically, at the first, second and third steps of the sequential analysis,

the ALJ found, respectively, that Plaintiff had not engaged in substantial gainful activity

since April 25, 2014; that he had the following severe impairments: "status post right

knee posterior cruciate ligament repair; [ADHD], cannabis use disorder; asthma; and

---

[89] 51
[90] 56
[91] 58
[92] 60
[93] 60
[94] 20-29

mild degenerative joint disease"; and that none of those impairments met or equaled a listed impairment.   The ALJ found that Plaintiff's Tourette's syndrome was not severe, though he considered it when formulating the RFC.

Before reaching the fourth step of the analysis, the ALJ found that Plaintiff had the following residual functional capacity ("RFC"): "[C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with the following limitations: occasionally stoop and climb stairs; no ladders or scaffolds; simple routine tasks; avoid respiratory irritants; and low stress work, defined as occasional decision making."[95]   The ALJ noted that in making his RFC determination, he did not find Plaintiff's complaints, concerning the extent of the limiting effects of his conditions, entirely credible for several reasons.   The ALJ observed, for example, that diagnostic testing of Plaintiff's back and right knee showed only very mild degenerative changes; that Kadakia had opined that even when Plaintiff's back was still inflamed he could still work at a job that did not involve heavy lifting, excessive walking or standing, and repetitive bending or twisting; that Plaintiff reported exercising regularly even with his ailments; that Plaintiff had frequently not followed through on Kadakia's treatment recommendations; and that there was a two-year period when Plaintiff did not seek any treatment related to his knee; and that Plaintiff was not taking any medications.[96]   With regard to opinion evidence, the ALJ indicated that he gave great weight to the opinions of Brownfeld and Eurenius, and some weight to the opinion of PA Duff.[97]

---

[95] 24
[96] 24-25
[97] 26-27

At the fourth step of the sequential evaluation the ALJ found that Plaintiff had no past relevant work.   And, finally, at the fifth step of the evaluation the ALJ found that Plaintiff can perform other work, consisting of the jobs identified by the VE.

The ALJ's decision did not mention any prior application for benefits.   In that regard, prior to the hearing, Plaintiff's counsel had, by letter, asked the ALJ to reopen a prior application:

> The claimant previously filed an application for Title XVI benefits on June 27, 2013, and the application was denied initially on September 26, 2013.   He applied for benefits less than 12 months later on April 25, 2014 with an alleged onset date of April 2, 2012.   Under 20 C.F.R. § 416.1488(a), I respectfully move to reopen the prior application.   His current application should be treated as an implied request for reopening within the 12 months of the prior denial. See, HALLEX I-2-9-10(B).[98]

Subsequently, at the start of the hearing, the following exchange took place between Plaintiff's counsel and the ALJ:

> ALJ:   I see there's a prior application that we've been asked to reopen because it was at, within a year and I'll, I'll take that under advisement.   And thank you for raising that issue.
>
> ATTY:   Thank you.[99]

That was the only mention of the prior application during the hearing.   The ALJ's decision did not expressly mention the prior application, but it clearly indicated (several times) that it was only considering whether Plaintiff was disabled at any time "since April 25, 2014, the date the [current] application was filed."[100]

---

[98] 245

[99] 36

[100] 20, 22, 28

Plaintiff appealed, but the Appeals Council declined to review the ALJ's determination.

On January 16, 2018, Plaintiff commenced this action. On August 3, 2018, Plaintiff filed the subject application for judgment on the pleadings, arguing that the Commissioner's decision should be reversed for three reasons: 1) "The ALJ's finding is not supported by substantial evidence, because Dr. Eurenius's opinion was too vague and ALJ failed to explain why he rejected certain portions of Dr. Brownfeld's opinion"; 2) "The ALJ's credibility finding was insufficient"; and 3) The ALJ constructively reopened Plaintiff's prior application and erroneously denied it, by reviewing evidence relevant to that application and rendering a decision on the merits." On September 26, 2018, Defendant filed the subject cross-motion for judgment on the pleadings. On October 17, 2018, Plaintiff filed a reply.

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

### The Prior Application

At the outset the Court rejects Plaintiff's contention that the ALJ implicitly reopened his earlier application. In that regard, Plaintiff contends that the ALJ did so by "reviewing evidence relevant to that application and rendering a decision on the merits." Plaintiff is attempting to rely on the Second Circuit's ruling in *Byam v. Barnhart*, 336 F.3d 172, 180 (2d Cir. 2003), in which the Circuit stated in pertinent part: "If the Commissioner reviews the entire record and renders a decision on the merits, the earlier decision will be deemed to have been reopened, and any claim of administrative res judicata to have been waived[.]" *Id.* (citations omitted). In this regard, the Second Circuit's reference to "a decision on the merits" means the merits of the earlier application. *See, Hussain v. Comm'r of Soc. Sec.*, No. 13 CIV. 3691 AJN GWG, 2014 WL 4230585, at *11 (S.D.N.Y. Aug. 27, 2014) ("The Second Circuit in *Byam* stated that it agreed with the district court that the ALJ had "not constructively reopened the previous applications, because he had not ruled on their merits"—referring to the fact that the ALJ had not ruled on the merits of the "previous application."), report and recommendation adopted, No. 13-CV-3691 AJN GWG, 2014 WL 5089583 (S.D.N.Y. Sept. 25, 2014). However, in that same decision the Circuit indicated that "constructive reopening" does not occur simply because an ALJ happens to review evidence that may also have relevance to an earlier application. *Byam v. Barnhart*, 336 F.3d at 181.

Here, the ALJ indicated at least three times in his written decision that he was finding only that Plaintiff was not disabled "since April 25, 2014," the date that the current application was filed,[101] and his references to medical evidence from 2012 and

---

[101] Therefore, while the ALJ did not expressly state that he was denying the Plaintiff's request to reopen the earlier application, it is clear that he did not grant the application.

2013 only pertained to his determination of that application.[102]   Accordingly, there was

no constructive reopening. *See, e.g., Hussain v. Commissioner*, 2014 WL 4230585 at

*12 ("ALJs regularly review prior evidence for the purpose of considering an open

application, as such evidence is often relevant to the claimant's medical condition for the

period in which benefits are claimed. In fact, there are many instances where an ALJ

*must* consider such prior evidence to properly assess the severity of the claimant's

medical condition during the open application period.   Given this reality, a court should

not infer that an ALJ considered the merits of a prior application simply because the ALJ

reviewed medical evidence dating from the prior application period.") (emphasis in

original, citations omitted).

<u>The Credibility Determination</u>

Plaintiff begins his argument concerning credibility by asserting that, "[a]t the

outset of his discussion of the RFC, the ALJ stated that he found Plaintiff incredible."[103]

That assertion is incorrect, however, since the ALJ actually made no such statement.

Indeed, the word "incredible" does not appear in the ALJ's decision.[104]

Plaintiff next asserts that the ALJ provided "no discussion" of the reasons

underlying his credibility determination.   Specifically, Plaintiff states:

> The ALJ engaged in no discussion of why he found Plaintiff incredible; instead, at
> the end of his discussion, he merely recited the regulatory factors applicable to
> the credibility analysis and conclusorily stated that he considered them.   Quite
> significantly, the ALJ did not mention Plaintiff's testimony at all in relation to his

---

[102] 25-25

[103] Docket No. [#7-1] at p. 11.

[104] What the ALJ actually stated was that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record," for reasons that he proceeded to explain.

credibility.[105]

Again, though, Plaintiff's assertion is not accurate.   In fact, as discussed earlier the ALJ offered various reasons why he found that Plaintiff's claims were not entirely consistent with the evidence, and in doing so he referenced Plaintiff's testimony.   For example, the ALJ stated:

> Despite testifying about his leg pain that prevents him from working, he reported he just applied for a job at a warehouse. Also, although he testified about problems with his attention and sleep, he stated he takes no medication[106] and is not in any mental health treatment.[107]

Further, the ALJ indicated that Plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual";[108] that Plaintiff's medical treatment "has been essentially routine and conservative in nature";[109] that Plaintiff "has not been entirely compliant in following treatment recommendations";[110] that Plaintiff "reported his activity level was moderate and that he exercised daily, including cycling and walking";[111] that Plaintiff "stated he has no problems with sleep or psychiatric complaints";[112] and that Plaintiff "reported he was not taking any of his prescribed medications."[113]   In sum, Plaintiff's contention that the ALJ provided "no discussion" of the reasons underlying his credibility determination is unfounded, and provides no basis to reverse the Commissioner's decision.

---

[105] Docket No. [#7-1] at p. 11.
[106] Plaintiff discontinued his ADHD medication.
[107] 24
[108] 25
[109] 25
[110] 25
[111] 25
[112] 25
[113] 25

<u>The Opinions of Drs. Eurenius and Brownfeld</u>

Plaintiff also contends that the ALJ's "RFC finding is not supported by substantial evidence because Dr. Eurenius's opinion was too vague and because the ALJ failed to explain why he rejected certain portions of Dr. Brownfeld's opinion. The Court disagrees with both of those contentions.

Regarding Eurenius's opinion, Plaintiff contends that the doctor's use of the word "moderate" to describe certain limitations is too vague to constitute substantial evidence. As mentioned earlier, Eurenius opined that Plaintiff was "moderately limited in bending, lifting, carrying, pushing or pulling due to chronic low back pain," and was also "moderately limited in kneeling, squatting, climbing and prolonged walking due to right knee pain." Citing cases such as *Moe v. Colvin*, 2017 WL 6379239 (W.D.N.Y. 2017) and *Gagovits v. Colvin*, 2016 WL 4491537 (E.D.N.Y. 2016), Plaintiff contends that Eurenius's use of the word "moderate" is too vague to be useful in making an RFC determination, and that the ALJ was therefore required to re-contact Eurenius for clarification.[114]

The cases upon which Plaintiff relies flow from the decision in *Curry v. Apfel*, 209 F.3d 117, 123-124 (2d Cir. 200), now superseded on other grounds, in which the Second Circuit, *sua sponte*, found that the opinion of consultative examiner, which used "the terms 'moderate' and 'mild,' without additional information, [did] not permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference that [the claimant] [could] perform the

---

[114]  Docket No. [#7-1] at p. 8.

exertional requirements of sedentary work," where such opinion was "[t]he only evidence supporting the ALJ's conclusion" that the claimant could perform sedentary work. Many district courts, including this one, have subsequently declined to accept disability-plaintiffs' arguments that *Curry* established a bright-line rule that terms such as "moderate" are too vague to constitute substantial evidence, and have distinguished *Curry* on its facts. For example, in *Mages v. Colvin*, the Court stated:

> [A]s this Court has noted (Siragusa, J.), "*Curry* does not stand for the broad proposition that a medical source opinion which uses terms like 'mild' or 'moderate' is always too vague to constitute substantial evidence." *Richardson v. Colvin*, 2016 WL 3179902, *7 (W.D.N.Y. June 8, 2016) (emphasis added). While the Court in *Curry* noted that the ALJ had "no additional information" besides the vague opinion, "courts have held that *Curry* is inapplicable, even though a medical examiner uses terms like 'mild' or 'moderate,' if the examiner conducts a thorough examination and explains the basis for the opinion." *Richardson*, 2016 WL 3179902, at *7; *see also Caci v. Colvin*, 2015 WL 9997202, *10 (N.D.N.Y. Dec. 22, 2015) ("Relying on [*Curry*], [p]laintiff correctly points out that a consultative examiner's report which concludes that a claimant's condition is 'mild' or 'moderate' without additional information does not allow an ALJ to infer that a claimant is capable of performing the exertional requirements of work. In this case, however, [the consultative examiner's] opinions were supported by her extensive examination of [p]laintiff.") (emphasis added) (citations omitted), report and recommendation adopted, 2016 WL 427098 (N.D.N.Y. Feb. 3, 2016).

> Here, Dr. Schwab completed a consulting physical examination, which revealed that plaintiff had a normal gait; could perform a heel-toe walk without difficulty; had a normal stance; used no assistive devices; needed no help changing for the exam or getting on or off the exam table; and was able to rise from the chair without difficulty. Plaintiff demonstrated some limited range of motion in the lumbar spine and ankles, but otherwise his physical examination was unremarkable. Considering Dr. Schwab's physical examination, the Court concludes that his opinion that plaintiff suffered "mild" limitations in bending, lifting, and carrying was not overly vague.

*Id.*, No. 1:14-CV-00828 (MAT), 2017 WL 2713727, at *3–4 (W.D.N.Y. June 24, 2017)

(Telesca, J.); *see also, Quintana v. Berryhill*, No. 1:18-CV-00561 (KHP), 2019 WL 1254663, at *17 (S.D.N.Y. Mar. 19, 2019) ("[C]ourts in this district have held that a medical source's use of the terms 'mild' or 'moderate' to describe a claimant's impairments does not automatically render their opinion vague as long as the opinion contains objective medical findings to support their conclusion.").

Here, the Court similarly finds that Eurenius's use of the term "moderate" is not too vague to constitute substantial evidence, when viewed in light of his entire report and the record as a whole.   In this regard, the Court notes initially that overall, the record in this case is one of the weakest that the Court has seen in terms of establishing total disability, notwithstanding the ALJ's finding that Plaintiff carried his burden at steps 1-4.   As for Eurenius's report, he indicated completely normal findings with regard to "neurologic," "extremities," "fine motor activity of hands" and cervical spine.[115]   When assessing Plaintiff's "general appearance, gait and station," Eurenius also noted essentially normal results, except that Plaintiff was somewhat limited in squatting and reported some pain in his back when walking on his toes.[116]   With regard to Plaintiff's knees, Eurenius found only "slight looseness" and some tenderness on the left side, while the right side was unremarkable except for some swelling "without signs of acute inflammation."[117]   As for the lumbar spine, Eurenius noted some "pain and tenderness" with flexion, extension, rotary movement and straight-leg raising," which, along with Plaintiff's self-report of "documented disc disease," caused Eurenius to conclude that

---

[115] 392
[116] 391
[117] 392

Plaintiff was "moderately limited in bending, lifting, carrying, pushing or pulling due to chronic low back pain."[118]   In particular, Plaintiff reportedly told Eurenius that, "[h]e had an MRI done," "which revealed a lumbar disc problem."[119]   However, as already discussed, the actual diagnostic testing of Plaintiff's lumbar spine revealed only " "minimal degenerative disc disease at L2-3 and L3-4," "very mild diffuse disc bulging from L2-3 through to L4-5" and "no focal disc herniation or nerve root compression," and his own primary care physician (Kadakia) told him that in light of such "mild" MRI findings, "the majority of [his continued complaints of] pain were due to inflammation and muscle spasm," which would "take additional time to improve."[120]  However, putting aside the fact that Plaintiff seems to have exaggerated the results of the MRI testing when speaking to Eurenius, Eurenius's use of the word "moderate" to describe Plaintiff's limitations is not too vague to constitute substantial evidence when considered in light of his entire report.   Plaintiff's objection on this point is odd in any event, since despite the fact that the Eurenius assessed even greater limitations than those suggested by Kadakia's report,[121] the ALJ gave "great weight" to Eurenius's report and limited Plaintiff to less than the full range of light work.[122]  In sum, Plaintiff's arguments concerning Eurenius's report lack merit.

As for Dr. Brownfeld, Plaintiff contends that the ALJ erred by "fail[ing to explain why he rejected certain portions of Dr. Brownfeld's opinion."   More specifically, Plaintiff

---

[118] 393
[119] 390
[120] 277
[121] 398-401
[122] 24

asserts that the ALJ "discarded" Brownfeld's opinion "that Plaintiff was *markedly* limited in making appropriate decisions and appropriately dealing with stress."[123] (emphasis in original). Although Plaintiff contends that the ALJ rejected "these marked limitations without explanation," the Court believes that Plaintiff's premise is mistaken, since the ALJ did not in fact reject those limitations.

Plaintiff's argument on this point is built on the fact that the ALJ indicated, as part of his discussion of Brownfeld's report, that he was giving Brownfeld's opinion both "partial weight" and "great weight."[124] Plaintiff asserts that the reference to "partial weight" means that the ALJ "rejected" Brownfeld's opinion that he has marked limitations in making decisions and dealing with stress, though Plaintiff's argument is expressly speculative: "From the ALJ's commentary, *it appears he may have rejected* Dr. Eurenius's opinion that they [(the limitations on stress and decision making)] stemmed from cannabis use.") Docket No. 7-1 at p. 9 (emphasis added).

However, regardless of the ALJ's use of the term "partial weight," it is evident that the ALJ did not reject Brownfeld's opinion concerning limitations on Plaintiff's ability to make decisions and deal with stress. Rather, the ALJ's RFC determination specifically accounts for such restrictions, by limiting Plaintiff to "simple routine tasks," involving only "low stress work, defined as occasional decisionmaking."[125] Indeed, in light of the actual RFC determination, it is unclear why Plaintiff believes that the ALJ "discarded" and "rejected" Brownfeld's opinion with regard to making decisions and dealing with stress.

---

[123] Docket No. 7-1 at p. 9 ("[T]he ALJ discarded these marked limitations without explanation.").
[124] 26
[125] 24

The ALJ never stated that he was rejecting *any* particular part of Brownfeld's opinion. At most, the ALJ used the term "partial weight" before indicating, at the conclusion of his discussion of Brownfeld's report, that he was giving Brownfeld's opinion "great weight."[126]

To the extent that Plaintiff is arguing that the ALJ should have found Plaintiff *disabled* based upon Brownfeld's opinion that Plaintiff was "markedly limited in making appropriate decisions and appropriately dealing with stress given his substance abuse history," the Court again disagrees. First and foremost, marked limitations in ability to handle stress or to make decisions do not necessarily render a claimant disabled,[127] and Plaintiff has not shown that the limitations on handling stress and making decisions that are included in the ALJ's RFC finding are incompatible with marked restrictions in those abilities.[128]

Additionally, Brownfeld's opinion (concerning Plaintiff's ability to make decisions

---

[126] Defendant's counsel seems to have accepted Plaintiff's premise on this point. *See*, Def. Memo of Law [#11-1] at p. 16 ("The ALJ explained that only partial weight was accorded to Dr. Brownfeld's opinion regarding decision-making and stress because he attributed the marked limitations to Plaintiff's cannabis use rather than any mental disease or defect."). The Court does not agree, but even if counsels' interpretation of that sentence in the ALJ's decision is correct and the Court's interpretation is wrong, it is irrelevant because the ALJ nevertheless included the restrictions in his RFC finding.

[127] *See, Miller v. Berryhill*, No. 6:16-CV-06467(MAT), 2017 WL 4173357, at *5 (W.D.N.Y. Sept. 20, 2017) ("[T]he Court notes that Dr. Ransom's opinion does not necessarily mandate a conclusion of disability due to the complete inability to deal with stress. Other courts in this Circuit have affirmed decisions denying benefits in cases where the record contains an opinion that the claimant has a "marked" limitation in performing a work-related function, such as found by Dr. Ransom.").

[128] *See, Miller v. Berryhill*, 2017 WL 4173357, at *6 (Rejecting Plaintiff's argument that RFC finding failed to fully account for marked limitation in dealing with stress, stating: "[A]s Defendant argues, the ALJ included additional limitations in the RFC formulation designed to address Plaintiff's difficulties in handling work-related stress. For instance, the ALJ restricted Plaintiff to unskilled jobs that involve only occasional changes in the work environment, that require her to make only occasional work-related decisions and judgments, and do not entail teamwork or collaboration. By definition, unskilled work requires little or no judgment to do simple duties that can be learned on the job in a short period of time, and requires working primarily with objects, rather than data or people.") (citations omitted).

and handle stress) was based solely on Plaintiff's statements to him concerning his alleged substance abuse, which Brownfeld evidently accepted as true. Specifically, Brownfeld stated: "He drinks alcohol daily until he gets drunk. He smokes 'a lot' of marijuana per day."[129] However, at the hearing, Plaintiff did not mention drinking alcohol or smoking marijuana excessively. To the contrary, Plaintiff's hearing testimony minimized his marijuana usage, in that he claimed he only "indulges" in marijuana sometimes, at night when he is unable to sleep,[130] and there was no testimony concerning alcohol consumption or abuse, even after Plaintiff's counsel asked him to consider whether there was anything else that might be preventing him from working.[131][132] Nor do the records from Plaintiff's treating sources reflect the type of substance abuse that Plaintiff described during his single interaction with Brownfeld.[133] Consequently, Plaintiff should not be permitted to now argue that the ALJ erred by failing to adopt an opinion of Brownfeld that was based on Plaintiff's subjective claim of substance abuse, when elsewhere in the record, including when testifying under oath at the hearing, Plaintiff has denied or minimized such substance abuse.

---

[129] 386

[130] *See*, 58 ("[ALJ:] [T]he medical records show that you have a history . . . of cannabis use, its's marijuana use, you still using marijuana? [Claimant:] Just at night time. I need to go to sleep. Like if I can't sleep then I'll indulge.").

[131] *See* 56 ("[Plaintiff's Attorney:] And so do you think there is anything else going on that we haven't talked about that's affecting your ability to work? [Claimant:] Not that I can think of.")

[132] The Court notes as an aside that Plaintiff's counsel's pre-hearing memorandum indicated that Plaintiff's alleged substance abuse was "immaterial." See, 246 (Referring to "co-occurring substance use disorders, immaterial." 246

[133] For example, on January 1, 2011, Plaintiff denied "using street drugs" (379); on January 2, 2012, he indicated that he consumed alcohol only occasionally, in social settings (252); on November 1, 2012 he "denie[d] illicit drug use" (302); on both January 17, 2013, and July 18, 2013, he denied using alcohol and denied any "recreational drug use" (276, 294); and on September 14, 2015, he stated that he drank only three beers per week. (420).

CONCLUSION

For the reasons discussed above, Plaintiff's motion for judgment on the

pleadings [#7] is denied, Defendant's cross-motion [#11] is granted, and this action is

dismissed.   The Clerk of the Court is directed to enter judgment for Defendant and

close this action.

So Ordered.

Dated: Rochester, New York
        May 23, 2019

                                        ENTER:


                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge